UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LINDA HARRELL

        Plaintiff,

  v.

                                          Case No. 11-15557

DELAWARE NORTH COMPANIES and           Honorable Julian Abele Cook, Jr.
SPORTSERVICE FOOD SERVICE, INC.,

        Defendants.


ORDER

       This is an employment discrimination, harassment, and retaliation lawsuit brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*., and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws §§ 37.2201 *et seq*. The Plaintiff, Linda Harrell, is suing her former employer, Sportservice Food Service, Inc. (doing business as the Delaware North Companies), claiming that she had been (1) subjected to unlawful acts of harassment and discrimination because of her gender, and (2) terminated as a form of retaliation for engaging in a protected activity. It is also her complaint that she was paid less than similarly situated male employees in violation of the Equal Pay Act provision of the Fair Labor Standards Act, 42 U.S.C. § 2000e-2.

       Currently before the Court is the Sportservice's motion for summary judgment pursuant to Fed. R. Civ. P. 56(c).


I.

During the middle of April in 2002, the Plaintiff was hired by the Defendant, Sportservice Food Service, Inc.[1] to act as the food and beverage manager for the company's baseball operations at the Comerica Park in Detroit, Michigan. During her first five years with Sportservice, she reported directly to its general manager, John Verespie. Under his management, the Plaintiff asserts that she had (1) consistently received favorable employee reviews, and (2) never been the subject of any employment disciplinary action.

In February of 2007, Verespie was promoted to the position of regional manager at Sportservice, and Jeffrey Behr was appointed to act as his successor. It was at this juncture that, in the Plaintiff's opinion, her relationship with Sportservice began to deteriorate. Indeed, according to the Plaintiff, Behr - within approximately one month of his job promotion - "made unwanted, unsolicited, sexual remarks . . . that she promptly reported to the Detroit [d]irector of [h]uman [r]esources, Douglas Gardner." (Plaintiff Aff. Ex. 4, ¶9, ECF No 37-7). More specifically, the Plaintiff asserts that Behr asked her "who did I have sex with, did I like sex, [and] how often did I have sex . . . ." (Plaintiff Dep. Ex.1, 53:7-8, ECF No. 29-1). Behr adamantly denies having made these comments. (Behr Dep. Ex. 5, 6:18-25; 7:1-14, ECF No. 29-5).

Following her first such encounter with Behr, she maintains that he "made numerous other sexual advances and engaged in inappropriate sexual conduct toward other female employees at

---

[1] On May 9, 2012, Sportservice filed a motion for summary judgment, arguing that the Plaintiff was employed by Detroit Sportservice, Inc., an unnamed party to this lawsuit. (Defs' Mot. Sum. J. ECF No. 4). The Court rejected the motion on the grounds that it was without sufficient information upon which to reach a definitive conclusion on the issue. (Order, October 3, 2012 ECF No. 13). The Defendants have reasserted this argument here without providing any additional supporting evidence. Thus, the Court rejects Sportservice's argument for the same reasons that were articulated in its October 3, 2012 order, and assumes that Harrell's employer was, in fact, Sportservice Food Service, Inc. *See Id.*

Comerica [Park], including those who were supervised by [her]." (Plaintiff Aff. ¶11). While failing to elaborate on this assertion with respect to her own experiences, the Plaintiff offers the affidavit of Christina Roulo, the suites manager at Comerica Park, as an example of the work environment that had been fostered by Behr's alleged misconduct. For example, according to Roulo, Behr referred to her as a "downriver stripper pole girl" in the presence of other employees. (Roulo Aff. Ex. 10, ¶6B, ECF No. 37-13). On a later occasion, Roulo contends that Behr "grabbed [her], kissed [her], and stuck his tongue in [her] mouth." (*Id.* at ¶6C). Finally, following the conclusion of a team meeting with four other male managers, Roulo maintains that "Behr proposed a game wherein he and the other males would guess how my personal [bodily] area [had been] shaved, . . . Behr ignored everyone's embarrassment and continued making comments about what he thought my personal [bodily] area might look like." (*Id.* at ¶6D). On May 11, 2009, Roulo resigned from Sportservice. (Roulo Resignation Letter, Ex. 14, ECF No. 29-14).[2]

According to the Plaintiff, she promptly reported each instance of Behr's allegedly inappropriate behavior to Douglas Gardner, Sportservice's director of human resources. Furthermore, the Plaintiff asserts that it was only after these complaints had been made to Gardner that she began to receive "requests of associate counseling" ("RAC") from Behr - the first step in the Sportservice disciplinary process. On August 27, 2007, the Plaintiff received the first of her three RACs, which alleged that she was rude and had made condescending remarks to her subordinates. As a result of this accusation, Harrell was required to participate in a harassment seminar.

---

[2] Notwithstanding Roulo's allegations of impropriety, she praised Behr in her resignation letter "for the opportunity to work and grow [in his] unit" and noted further that she "learned a great deal from [her] experiences at the park and appreciate[d] all that [he] taught [her]." *Id.*

On March 8, 2008, Harrell received her 2007 annual performance review with an overall evaluation that was below the "meets expectation" level. This appraisal, authored by Behr, was likewise repeated in the Plaintiff's 2008 and 2009 performance reviews. Although the Plaintiff maintains that her negative reviews and the RACs were clearly a product of retaliatory animus, Sportservice insists that there is a plethora of independent evidence to substantiate these noted deficiencies. First, Sportservice points to the general criticism–allegedly generated by the Plaintiff's colleagues and communicated to Behr and Gardner–which contained the general tone that she was often demeaning and unprofessional in her interactions with staff. With respect to the Plaintiff's second RAC, she admitted to having publicly asserted that a fellow Sportservice employee was utilizing a "fag cart" around the ballpark. (Plf's Dep. 28:1-4).

Along these same lines, on July 28, 2008, Denise Kowalewski-Tucker, Sportservice's catering and sales manager, resigned due to alleged "harassment and retaliation from [her] manager, Linda Harrell." (Kowalewski-Tucker Resignation Letter, Ex. 12, ECF No. 29-12). In fact, in her resignation letter, Kowaleski-Tucker specifically noted that she had "reported the harassment and retaliation that [she] received from [the Plaintiff] along with many other employees [who had been harassed by her.] [Despite keeping] detailed documentation of all my complaints . . . not only have I have not seen any improvement, but my working environment has become unbearable." *Id.*

On September 22, 2009, the Plaintiff and Behr were issued "final RAC's" by the Company in an attempt to improve the communication problems between them. (Final RAC, Ex. 4, ECF No. 29-4). According to the report, Behr and the Plaintiff "equally contributed to the disruption of the workplace and divided [the] team." (*Id.*) Both employees were cautioned in these RACs that "if a correction [was] not made, it may result in disciplinary action . . . including termination." (*Id.*)

4

Interestingly, in the Plaintiff's response to the final RAC, she maintained that there was "nothing wrong with Jeff Behr and my [sic] working relationship. It is no different than our past GM [Verespie]." (Plaintiff Resp. to RAC, Ex. 8, ECF No. 29-8). She went on to state that "I am not broken and neither is Jeff. I think we need to continuously work on and develop a better working relationship. I never said I did not like Jeff." (*Id.*). In fact, contrary to the allegations here, the Plaintiff highlighted three different examples of her positive "working relationship" with Behr, noting that, on various occasions, she (1) asked him to join her for dinner at the "tiger club," (2) offered to assist him in his responsibilities as operations manager, and (3) had invited him to play golf. (*Id.*))

Finally, on April 10, 2010, the Plaintiff–upset by Behr's refusal to give an acceptable wage increase to one of her subordinates–left an agitated voice mail which reflected her frustration with the then state of affairs:

> Hey Jeff, it's Linda. I just want to let you know Laurie just called me and she quit. So, you know what? I just want to let you know that if she quit, I'm quitting too. So you need to find yourself a new food or beverage manager . . . I warned you and we've been talking about this for like a good month or two right now. But I just want to let you know that I am not coming into work tomorrow to get all of this stuff done. You know what, I'm going to give you my notice too. I can't do all the stuff by myself. I need help. So we need to talk first thing in the morning. Just please call me. I don't even care if its 3:00 in the morning. Call me.

(Plf's Voicemail, Ex. 16, ECF No. 29-16). The next day, the Plaintiff showed up for work and continued to perform her duties without incident. Upon learning that Behr and his superiors had interpreted her voice mail as an official resignation, however, she acknowledged being "concerned and frustrated but . . . had no intention of quitting . . . ." (Plf's Aff. ¶30). On April 15, 2010, despite the Plaintiff's insistence that she had no interest in leaving Sportservice, Behr and Gardner

"accepted" her resignation. Behr maintains that, consistent with Sportservice protocol, he assumed the Plaintiff's job responsibilities until a replacement was hired. (Behr Dep. 27-28).

On December 19, 2011, the Plaintiff filed a complaint in this Court, in which she alleged that Sportservice had violated her right to be free from harassment, discrimination, and retaliation in the workplace.

## II.

The purpose of the summary judgment rule, as reflected by Federal Rule of Civil Procedure 56, "is to isolate and dispose of factually unsupportable claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, the entry of a summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties." *Aqua Grp., LLC v. Fed. Ins. Co.*, 620 F. Supp. 2d 816, 819 (E.D. Mich. 2009) (citing *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). In order for a dispute to be genuine, it must contain evidence upon which a trier of the facts could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 560 (6th Cir. 2004). When assessing a motion for the entry of a summary judgment, a court "must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). The entry of a summary judgment is appropriate only if the nonmoving party fails to present evidence which is "sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial." *Celotex*,

6

477 U.S. at 322.

Thus, the moving party has the initial obligation of identifying those portions of the record that will demonstrate the absence of any genuine issue of a material fact. *Celotex*, 477 U.S. at 323. Thereafter, the nonmoving party has the obligation to "come forward with some probative evidence to support its claim and make it necessary to resolve the differences at trial." *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir. 1991); *see also Anderson*, 477 U.S. at 256. ELCRA R. Civ. P. 56(c)(1).

III.

Sportservice seeks the entry of a summary judgment in connection with each of the Plaintiff's seven claims under Title VII, ELCRA, and the Equal Pay Act. The Court will address each of them seriatim. In her complaint, the Plaintiff contends that she was subjected to a hostile work environment based upon her gender in violation of Title VII and ELCRA. Similar to the prohibitions under Title VII, ELCRA prevents employers from taking an adverse employment action based on "discriminat[ion] against an individual with respect to employment . . . because of . . . sex . . . ." Mich. Comp. Laws § 37.2202. Accordingly, "the ELCRA hostile work environment analysis is identical to Title VII's analysis." *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468 (6th Cir. 2012).

In *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66 (1986), the Supreme Court held that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex created a hostile or abusive work environment. However, Title VII is not "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Rather, the focus in a sexual harassment claim is "whether members of one sex are exposed to

7

disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* In other words, "the conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are acting because of the victim's gender." *Wasek,* 682 F.3d at 467. A plaintiff may rely on direct or circumstantial evidence to establish a Title VII claim. *Johnson v. University of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). Where, as here, the Plaintiff has failed to proffer any direct evidence of discrimination, the analysis by this Court of her sexual harassment claim must proceed according to the often-quoted burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Utilizing this standard, a plaintiff must establish a *prima facie* case by demonstrating evidence of harassment that is (1) not welcomed, (2) based on sex, (3) sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment (or any matter directly or indirectly related to employment), and (4) committed by a supervisor or in such a way that the employer, through its agents or supervisory personnel, knew or should have known about the challenged acts of misconduct yet failed to take any immediate and appropriate corrective action. *Knox v. Neaton Auto Products Mfg., Inc.*, 375 F.3d 451, 459 (6th Cir. 2004).

Here, as with the vast majority of Title VII sexual harassment cases, the analysis turns on whether the allegedly wrongful conduct was "sufficiently severe or pervasive" to establish a hostile work environment. In *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-23 (1993), the Supreme Court explained that courts must assess the severity and/or pervasiveness of the alleged misconduct by employing an objective as well as a subjective standard. Thus, the misconduct about which an aggrieved party has complained must (1) be sufficiently severe or pervasive so as to create the type of environment that a reasonable person would find to be hostile or abusive, and (2) cause the victim to subjectively regard the environment as abusive. *Id.* at 21-22. In evaluating the intensity of the

8

alleged conduct, a court is directed to consider its frequency, severity, "whether it is physically threatening or humiliating, or a mere offensive utterance . . . . " and if it "unreasonably interferes with an employee's performance." *Id.* at 23. Indeed, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, (1998).

The crux of the Plaintiff's contention that she was subjected to a hostile work environment is based upon two lines of evidence. First, she points to her own personal experience which was seemingly limited to two interactions, namely: (1) at a bar following a work function in 2007, Behr allegedly asked that Plaintiff if she "liked sex" in addition to an inquiry into the frequency and nature of her sexual history, and (2) in April 2009, a coworker used the term "toots" when addressing her. (Plaintiff Dep. 83-84). Outside of her own experiences, she relies on the "other acts" of harassment that were allegedly suffered by Roulo. More specifically, Roulo maintains that Behr (1) referred to her as a "downriver pole dancer", (2) forcibly grabbed and kissed her, (3) made inappropriate comments concerning her bodily personal area, and (4) greeted her in his t-shirt and boxer shorts when she arrived at his hotel room during a business trip. According to the Plaintiff, all of this evidence, when taken together, demonstrates that her work environment was objectively hostile.

Following its review of this issue, the Plaintiff has failed to convince the Court that her sexual harassment claim meets the subjective or objective components required under *Harris*. Indeed, the record is replete with examples which facially contradict the Plaintiff's suggestion that she viewed her work environment as being hostile. In fact, notwithstanding the Plaintiff's May 28, 2009 "hostile environment complaint," she -  in response to a disciplinary citation - touted her

positive "working relationship" with Behr, while denying having said she "did not like Jeff." (Plf's Resp. to RAC, . Ex. 8, ECF No. 29-8). Moreover, in an email to Behr and Verespie on April 14, 2010, the Plaintiff emphatically stated that she "love[d] working at Comerica Park." (Plf's email, Ex. 29, ECF No. 37-32). At a minimum, these statements appear to suggest that Harrell found her work environment to be, at least, tolerable.

Even assuming, *arguendo*, that the Plaintiff subjectively regarded her work environment as abusive, the Court is not persuaded that she has proffered enough evidence from which a reasonable person would find that, in the totality of the circumstances, the unwelcome conduct was sufficiently severe or pervasive to create a hostile work environment. While she has focused on a number of individual incidents that may have occurred over the course of her employment, "the issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether–when taken together–the reported incidents make out such a case." *Bowman v. Shawnee State University*, 220 F.3d 456, 463 (6th Cir. 2000). Furthermore, the Sixth Circuit has expressly rejected hostile-environment claims which arise from those facts that are far more compelling than the universe of "incidents" alleged here. In *Stacy v. Shoney's, Inc.*, No. 97–5393, 1998 WL 165139, at *1–3 (6th Cir.1998), for example, the court held the plaintiff failed to show the existence of a hostile work environment where, over a two-month period, a male supervisor continuously made sexually suggestive comments about the female plaintiff's appearance, touched her breast as he removed and replaced a pen from her shirt pocket, leered at her, and told her "if [he] had someone that looked like [her], [he would] not let them leave the house." By contrast, in *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 271 (6th Cir. 2009), the court found a jury question as to severity and pervasiveness of alleged harassment where (1) the

10

plaintiff was repeatedly called "bitch" by a co-worker in anger; (2) the plaintiff was referred to as a heifer with "milking udders;" (3) the company's female customers and associates were identified by such vile words as "whores," "sluts," "dykes" and "cunts;" and (4) the plaintiff's co-workers discussed and openly viewed obscene photographs and pornographic magazines and engaged in explicit conversations about their own sexual practices and exploits at strip clubs.

Here, although Behr's alleged comments were offensive, they were simply not sufficiently frequent, severe, physically threatening, or humiliating to unreasonably interfere with the Plaintiff's work performance. Moreover, the bulk of the allegedly offending conduct occurred outside of the Plaintiff's presence and seemingly had little, if any, direct impact on her work environment - which is evident in her correspondence with Sportservice. Although the Court has, nonetheless, considered these allegations in its analysis, these comments do not lend support to the Plaintiff's position that her work environment was objectively hostile. Indeed, her allegations depict isolated incidents rather than an ongoing situation. The Sixth Circuit has frequently stated that "[i]solated incidents . . . unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment." *Bowman,* 220 F.3d at 463. As such, the Court grants Sportservice's request to dismiss Harrell's sexual harassment claims.

## IV.

The Plaintiff also alleges that she was subjected to acts of discrimination by the Defendant because of her gender in violation of Title VII and ELCRA. Similar to the sexual harassment analysis, discrimination "[c]ases brought pursuant to [these statutes] are analyzed under the same evidentiary framework used in Title VII cases." *Humenny v. Genex Corp*, 390 F.3d 901, 906 (6th Cir. 2004). Gender discrimination claims can be established by direct or circumstantial evidence.

11

*Vredevelt v. The GEO Group, Inc.*, 145 Fed. Appx. 122, 127 (6th Cir. 2005). A review of the evidence indicates that the Plaintiff has not presented any direct evidence of gender discrimination, which requires the application of the *McDonnell Douglas* burden-shifting framework. 411 U.S. 792, 802.

In order to establish a *prima facie* case of gender-based disparate treatment, the plaintiff must show that she: (1) is a member of a protected class, (2) was subjected "to an adverse employment action," (3) was "qualified for the job, and (4) treated differently than similarly situated male employees for the same or similar conduct." *Humenny*, 390 F.3d at 906. If she "establishes a prima face case of gender discrimination, the burden of production shifts to the defendant to provide a legitimate, nondiscriminatory reason for the employment action." *Id*. Finally, if the defendant employer satisfies this burden of production, "the plaintiff must then produce evidence that the defendant's proffered reason is a pretext for discrimination." *Id.*

Sportservice argues first that the Plaintiff cannot establish that she suffered an adverse employment action. However, she claims to have suffered a number of adverse work experiences, all of which were attributable to the Defendant, including (1) negative performance evaluations, (2) additional job responsibilities, and (3) the loss of her job. In *Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007), the Sixth Circuit defined an "adverse employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. Such a change must be more disruptive than a mere inconvenience or an alteration of job responsibilities." (citations omitted).

With respect to the Plaintiff's first argument relating to this issue, the Sixth Circuit has

12

expressly held that "a negative performance evaluation does not constitute an adverse employment action, unless the evaluation has an adverse impact on an employee's wages or salary." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007).  The Plaintiff does not allege that her salary was adversely affected by the negative reviews, so this argument fails to hold water. To the extent that she is suggesting that the negative evaluations were the catalyst for her alleged termination, this claim is no different in substance from her third argument, which the Court considers below. Finally, as to the suggestion that Harrell was assigned additional job responsibilities, the record is clear that all managers were required to temporarily assume their subordinate's position during times of need which appears to be the crux of the Plaintiff's complaint in this regard. *See* (Verespie Dep. 59-60; Harrell's Dep. 104-105). Indeed, she has failed to direct the Court to any authority which suggests that a "significant change in employment status" can be established under these facts.

Furthermore, she claims to have been adversely affected by virtue of losing her job at Sportservice. Although the termination of a job is clearly recognized as an adverse employment action, the parties vigorously dispute whether the Plaintiff was fired or resigned. The genesis of this dispute stems from a voicemail message that was left by her for Behr on April 10, 2013. According to Sportservice, the voicemail clearly indicates that Harrell verbally resigned from her position, which it accepted on the following day. On the other hand, the Plaintiff maintains that she did not quit, pointing out that "[r]ather, she showed up for work the next day, on time as usual" and "made it clear to the Defendants that she did not resign but was frustrated and voiced her frustration on the voice message."  (Pltf's Brf. 11).

While admittedly a close call, the Court is not persuaded that the Plaintiff intended to resign

13

her position. Indeed, the audio of the message reveals a highly agitated and emotional individual, but one who appears to be searching for a workable solution rather than definitively waiving the white flag. Moreover, the Plaintiff's actions on the following day support the notion that she never intended to resign her position. As such, the Court concludes that the Plaintiff has established, by a preponderance of the evidence, that she suffered an adverse employment action.

However, her burden does not end here. Under the *McDonnell Douglas* framework, she must establish the fourth element of her *prima facie* case, i.e., that similarly situated male co-workers were treated more favorably, and, moreover, that Sportservice's legitimate nondiscriminatory reasons for her termination were merely a pretext for gender discrimination.

The Court finds that the Plaintiff has failed in both respects. First, to be considered "similarly situated", "the individuals [with] whom [she] compares herself must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Humenny*, 390 F.3d at 906.  The universe of the Plaintiff's evidence on this score is that, unlike her, the male employees were not forced to assume the duties of their subordinates who quit or were fired. (Plf's Brf. 22).[3] Not only is this contention refuted by the testimony of Verespie and Behr, (Verespie Dep. 59-60; Behr Dep. 27-28), "the Plaintiff's subjective opinions and beliefs are insufficient to create a genuine issue of material fact on the disparate

---

[3] The Plaintiff has failed to substantiate any of her other allegations of disparate treatment. It is well understood that "it is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."  *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997). Indeed, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379–80 (6th Cir.2007).

treatment element of her *prima facie* gender discrimination case." *Williams v. Serra Chevrolet Automotive, LLC*, 12-11756, 2014 WL 897365, *8 (E.D. Mich. March 6, 2014) (citing *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008). As such,  the Plaintiff has failed to establish a *prima facie* case of gender-based disparate treatment.

In light of this conclusion, there is no need for the Court to address the subject of pretext. Even if this issue was considered and evaluated, the Plaintiff cannot defeat Sportservice's motion for summary judgment on this claim. As discussed, Sportservice has presented ample evidence of legitimate, non-discriminatory reasons for the termination of her job. *Supra,* 3-5. Therefore, the Plaintiff must come forward with evidence that Sportservice's proffered reasons are a pretext for the claims of discrimination. "Pretext can be established by showing that the Defendants' proffered reasons for her termination (1) have no basis in fact, (2) did not actually motivate Defendants' decision to terminate, or (3) are insufficient to warrant her termination." *Williams,* 2014 WL 897365, *10 (citing *Murphy v. Ohio State Univ.,* 2013 WL 5878184, *7 (6th Cir. 2013).  The Sixth Circuit "has adopted the honest belief rule at the pretext stage of the evaluation of discrimination claims." *Id.* In essence, "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Id.*

The Court need not spill a considerable amount of ink addressing this component of the burden-shifting analysis for a number of reasons. First, the Plaintiff, presumably relying on the perceived strength of her *prima facie* case, failed to address the issue of pretext in her brief. Second, as discussed, Sportservice has offered an independently persuasive explanation for the reason that the Plaintiff's employment was terminated; namely, she (1) received multiple disciplinary citations, (2) had difficulty getting along with her superiors, (3) was the subject of a harassment complaint by

a former Sportservice employee, and (4) consistently scored below expectations on her annual reviews. "Poor performance is a legitimate, nondiscriminatory reason for terminating a person's employment." *Imwalle v. Reliance Medical Products, Inc.,* 515 F.3d 531, 546 (6th Cir. 2008). Moreover, she has failed to produce "sufficient evidence from which the jury could reasonably reject [the Defendants'] explanation and infer that [they] intentionally discriminated against [her]." *Braithwaite v. Timken Co.,* 258 F.3d 488, 493-94 (6th Cir. 2001). As such, the Plaintiff's discrimination claims must fail.

## V.

Moving next to Harrell's Title VII and ELCRA claims of retaliation, the same direct/circumstantial evidentiary framework from *McDonell Douglas* and its progeny applies here. The Court begins by noting that the Plaintiff has not presented any direct evidence of retaliatory conduct by the Defendants - such as an explicit statement from Behr that he was firing her in response to her harassment claims - and, as such, both claims are analyzed under the *McDonnell Douglas* burden-shifting analysis. In order to establish a *prime facie* case of retaliation, the Plaintiff must establish that (1) she was engaged in a protected activity during the times that are relevant to this controversy, (2) Defendants knew of her protected activity, (3) they thereafter took an adverse employment action against her, and (4) there is a causal connection between the protected activity and the adverse employment action. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013), reh'g denied (Apr. 12, 2013). While Sportservice maintains that the Plaintiff cannot establish any of the elements required under *McDonnell Douglas*, the Court has concluded that the Plaintiff has demonstrated that she suffered an adverse employment action. As such, the Court considers any further analysis of that requirement to be unnecessary here.

16

The first issue is whether the Plaintiff's actions constituted a "protected activity." Although the Sixth Circuit has held that making an informal complaint to an employer about discrimination constitutes a "protected activity" under Title VII, *see E.E.O.C. v. Romeo Cmty. Schs.*, 976 F.2d 985, 989-90 (6th Cir.1992), these allegations of impropriety must be sufficiently specific to inform the employer that an unlawful conduct has occurred. *Compare Fox v. Eagle Distrib. Co., Inc.,* 510 F.3d 587, 591 (6th Cir.2007) (informal complaint of age discrimination that did not refer to specific conduct was not protected activity); *with   Romeo Cmty. Schs.*, 976 F.2d at 989-90 (informal complaint by female employee that her employer was "breaking some sort of law" by paying her less than men was protected activity).

Here, the Plaintiff filed an informal complaint which contained (1) the name of the alleged perpetrator, (2) a recitation of Sportservice's sexual harassment/retaliation policy and the procedures to be followed, and (3) specific examples of the comments that she believed to be unlawful (i.e. "Jeff Behr asked me if I like sex and how often did I have sex?). (Plf's letter, Ex. 23, ECF No. 37-26). Clearly, these allegations were sufficient to put Sportservice on notice of the allegations within the complaint and the legal basis upon which she was relying. Taking these facts in the light most favorable to the non-movant, as the Court must, Sportservice should have known that the Plaintiff was attempting to exercise her rights under Title VII when she complained about Behr's inappropriate comments.

Closely related to the first factor is the second: namely, that Sportservice had implicit knowledge of the Plaintiff's protected activity. In addition to the written complaint that she allegedly sent to Verespie, the Plaintiff also claims to have raised her concerns about the work environment to the Defendants on several occasions. (Plaintiff Aff. ¶ 12). Although the Plaintiff's superiors

17

testified that they were unaware of her complaints, the Court may not weigh the credibility of the evidence on a motion for summary judgment. As such, the Plaintiff has provided sufficient evidence to create a genuine issue of a material fact to be resolved by the jury as to whether her superiors were on notice of her protected activity. *See Auten v. Brooks,* 2006 WL 2090095, at *7 (S.D.Ohio July 25, 2006) (plaintiff satisfied first three prongs of his *prima facie* case with allegations of complaints by him to his immediate supervisor and that he was later fired).

Finally, Sportservice contends that the Plaintiff cannot satisfy the fourth element of her *prima facie* case, which requires her to establish the existence of a causal connection between the employee's complaint and the claimed adverse action. As the Supreme Court recently clarified in *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533; 186 L. Ed. 2d 503 (2013), "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Here, the Plaintiff has failed to proffer any evidence which suggests that her termination was causally linked to her complaint(s). In fact, the circumstantial evidence cuts sharply against such an inference. Even though the Plaintiff's written complaint was submitted to Verespie on May 28, 2009, she remained employed at Sportservice until April 15, 2010 - over a year later. Thus, it appears that temporal proximity is not on her side. Morever, even assuming, *arguendo*, that she was terminated (which is a question of fact for the jury) it was not until after the agitated voicemail had been left with Behr that she was officially relieved of her duties. Accordingly, the Plaintiff has failed to present evidence that "but-for" Sportservice's desire to retaliate against her for engaging in a protected activity she would not have been terminated.

In light of the Plaintiff's inability to satisfy her burden on the "but-for" causation element of her *prima facie* case, there is no need to address the issue of pretext. Even if the Court did give this issue some consideration, the Plaintiff has failed to present a sufficiency of evidence that would permit a reasonable juror to conclude that Sportservice's legitimate, non-discriminatory reasons for her termination were a pretext for retaliatory animus. Indeed, the Court has previously discussed her failure to establish pretext, and finds that those same reasons are equally applicable here. As such, the Plaintiff's retaliation claim must fail.

VI.

Unlike discrimination and retaliation claims, Harrell's Equal Pay Act ("EPA") claim arises under a different statutory scheme with its own unique framework for adjudication. As a general matter, "the EPA prohibits employers from paying an employee at a rate less than that paid to an employee of the opposite sex for performing equal work." *Beck-Wilson v. Principi,* 441 F.3d 353, 359 (6th Cir. 2006) (citing 29 U.S.C. § 206(d)(1)). In order to establish a *prima facie* case under the EPA, a plaintiff "must show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Id.* In determining whether work is substantially equal, the "controlling factor under the Equal Pay Act is job content- the actual duties that the respective employees are called upon to perform." *Carey v. Foley & Lardner, LLP*, 11-10818, 2013 WL 4747825, *2 (E.D. Mich. Sept. 4, 2013).

Once a plaintiff establishes a *prima facie* case of wage discrimination, the burden shifts to the defendant to prove that the difference in wages is justified by one of the affirmative defenses enumerated in 29 U.S.C. § 206(d)(1), to wit: "(1) a seniority system; (2) a merit system; (3) a system

19

that measures earnings by quantity or quality of production; or (4) any factor other than sex." *Vehar v. Cole Nat. Grp., Inc.,* 251 F. App'x 993, 1000 (6th Cir. 2007).

Here, the Plaintiff argues conclusively that (1) she was required to assume the duties of her subordinates without additional compensation, and (2) "a chef who was subordinate to her was paid more than she was as the Food and Beverage Service Manager." (Plf's Brf. 23-24). With respect to the Plaintiff's first point - which has little to do with the EPA analysis in the first place - she fails to present any evidence that male employees were not required to assume similar responsibilities - let alone suggest that they were paid more for substantially less work. In fact, as previously discussed, both Behr and Verespie testified that all managers were required to assume the duties of their departed subordinates. As for the allegation that one of her male subordinates received a greater compensation than she received, the Plaintiff has failed fails to establish, *inter alia*, that the job duties of a chef are substantially comparable to that of a food and beverage manager. Indeed, Harrell does not address the chef's professional background, the supposed differences in pay, or the overlap in their responsibilities. Without more, the Court is left only to assume that the duties of a "chef" and "food and beverage manger", are incongruous. For all of these reasons, the Court finds that the Plaintiff has failed to set forth a prima facie case under the EPA, and thus dismisses her claims.[4]

VII.

For the reasons that have been stated above, the Defendants' motion for summary judgment is granted in all respects. (ECF No. 28).

---

[4] Sportservice does not argue, in the alternative, that one of the affirmative defenses listed under 29 U.S.C. § 206(d)(1) should apply, but the Court need not address this layer of the analysis where, as here, the Plaintiff has failed to establish a *prima facie* case.

IT IS SO ORDERED.

Date: September 21, 2014                          s/Julian Abele Cook, Jr.
                                                 JULIAN ABELE COOK, JR.
                                                 U.S. District Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on September 21, 2014.

                                                 s/ Kay Doaks
                                                 Case Manager

21